## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| JOHN PATCHAN,<br><br>        Plaintiff,<br><br>  vs.<br><br>ENGILITY HOLDINGS, INC., JOHN BARTER, STEVEN A. DENNING, LYNN A. DUGLE, DAVID M. KERKO, PETER A. MARINO, KATHARINA MCFARLAND, DARRYLL J. PINES, ANTHONY PRINCIPI, CHARLES S. REAM, DAVID A. SAVNER, WILLIAM G. TOBIN, and DAVID J. TOPPER<br><br>        Defendants. | Case No.:<br><br>__COMPLAINT__<br><br>__DEMAND FOR JURY TRIAL__ |

### COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff John Patchan ("Plaintiff") brings this suit for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934. In support of this complaint, Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

### INTRODUCTION

1.    Plaintiff brings this action against Engility Holdings, Inc., ("Engility" or the "Company"), and the Company's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below), for violations of Sections 20(a) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder ("Rule 14a-9"). Specifically, Defendants solicit stockholder approval in connection with the sale of the Company to Science Applications International Corporation ("SAIC"), through a registration statement that omits material facts necessary to make the statements therein not false or

1

misleading.[1] Stockholders require this material information to decide whether to vote in favor of the proposed transaction.

2.      On September 9, 2018, the Company announced that it had entered into an agreement and plan of merger (the "Merger Agreement"), by which SAIC will acquire all of the outstanding shares of Engility in an in an all-stock transaction at a fixed exchange ratio (the "Exchange Ratio") of 0.450 SAIC shares for each Engility share (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $2.5 billion and, upon closing, SAIC shareholders will own approximately 72% and Engility shareholders will own approximately 28% of the combined company on a pro forma, fully diluted basis.

3.      On October 18, 2018, Defendants issued a materially incomplete and misleading Form S-4 Registration Statement (the "Registration Statement") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Registration Statement is materially misleading in that it fails to provide adequate disclosure of material information related to the Proposed Transaction.

4.      Specifically, the Registration Statement fails to disclose material information concerning the background of the sale process, the financial analyses conducted by Guggenheim Securities, LLC ("Guggenheim"), Engility's financial advisor, and potential conflicts of interest involving the financial advisor. The omission of this material information renders the Registration Statement materially incomplete and misleading in violation of §§ 14(a) and 20(a) of the Exchange Act.

---

[1] The Company and the Individual Defendants are referred to herein as "Defendants."

5.      For these reasons and as set forth in detail herein, the Individual Defendants, and the Company, have violated federal securities laws. Accordingly, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of these laws. Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder

7.      Personal jurisdiction exists over each Defendant either because the Defendant is headquartered in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Engility is headquartered in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

9.      Plaintiff is, and has been at all relevant times, the owner of shares of Engility common stock.

10.     Defendant John Barter ("Barter") has served as a director of Engility since 2017.

11.     Defendant Steven A. Denning ("Denning") has served as a director of Engility since 2015.

12. Defendant Lynn A. Dugle ("Dugle") is Chairman of the Board, President and Chief Executive Officer of Engility. She has served as a director of the Company since 2015.

13. Defendant David M. Kerko ("Kerko") has served as a director of Engility since 2015.

14. Defendant Peter A. Marino ("Marino") is co-chairman of Engility's Board and has served as a director of Engility since 2015.

15. Defendant Katharina McFarland ("McFarland") has served as a director of Engility since 2017.

16. Defendant Darryll J. Pines ("Pines") has served as a director of Engility since 2012.

17. Defendant Anthony Principi ("Principi") has served as a director of Engility since 2012.

18. Defendant Charles S. Ream ("Ream") has served as a director of Engility since 2012.

19. Defendant David A. Savner ("Savner") has served as a director of Engility since 2012.

20. Defendant William G. Tobin ("Tobin") has served as a director of Engility since 2012.

21. Defendant David J. Topper ("Topper") has served as a director of Engility since May 24, 2018.

22. Defendants Topper, Tobin, Savner, Ream, Principi, Pines, McFarland, Marino, Kerko, Dugle, Denning, and Barter, are collectively referred to as "Individual Defendants" and/or the "Board."

23.     Defendant Engility is a leading provider of integrated solutions and services, supporting U.S. government customers in the defense, federal civilian, intelligence and space communities. Engility offers a broad range of highly technical services, leveraging its strengths in systems engineering, cybersecurity, high performance computing, enterprise modernization, and training and mission operations to solve customers' most difficult challenges. The Company, incorporated in Delaware, is headquartered at 64803 Stonecroft Boulevard Chantilly, VA 20151. Engility's common stock trades on the New York Stock Exchange under the symbol "EGL."

## OTHER RELEVANT ENTITIES

24.     SAIC is a leading provider of technical, engineering and enterprise information technology (IT) services primarily to the U.S. government. SAIC provides engineering, systems integration and information technology offerings for large, complex government projects and offer a broad range of services with a targeted emphasis on higher-end, differentiated technology services. SAIC's end-to-end enterprise IT offerings span the entire spectrum of its customers' IT infrastructure. The Company is incorported in Delaware and headquartered at 12010 Sunset Hills Road, Reston VA 20190. SAIC's common stock trades on the New York Stock Exchange under the symbol "SAIC."

25.     Raptors Merger Sub, Inc. ("Merger Sub") a direct wholly owned subsidiary of SAIC, is a Delaware corporation formed on September 5, 2018 for the purpose of effecting the merger. Upon completion of the merger, merger sub will be merged with and into Engility with Engility surviving as a direct wholly owned subsidiary of SAIC.

## FURTHER SUBSTANTIVE ALLEGATIONS

**The Merger Process**

26.     In February 2018, Defendant Dugle received a call from Anthony Moraco ("Moraco"), Chief Executive Officer of SAIC, concerning the possible merits of SAIC and Engility combining with each other in a strategic transaction.

27.     That same month, on February 26, 2018, Engility and SAIC entered into a non-disclosure agreement to facilitate the exchange of confidential information and further discussions.

28.     Approximately three months later, on May 23, 2018, the Engility Board convened a meeting to review the preliminary discussions and information exchange between the members of Engility and SAIC management. Evidently pleased with the status of these discussions, the Engility Board determined to appoint a strategy committee (the "Engility Strategy Committee") to assist the Engility Board in identifying, reviewing and assessing strategic alternatives, including potential mergers, acquisitions and other business combinations. Appointed to this committee were five members of Engility's Board, Defendant Dugle, Defendant Savner, Defendant Kerko, Defendant Topper, and Defendant Marino.

29.     As part of these efforts, on June 8, 2018, Engility held discussions with representatives from a publicly-traded engineering, construction and government services firm ("Company A"). These preliminary discussions led to a meeting between Defendant Dugle and the Chief Executive Officer of Company A to further discuss a potential business combination involving Company A and Engility. Following this conversation, Engility then entered into a non-disclosure agreement with Company A later that same date to facilitate the mutual exchange of confidential information.

30.     To further assist in the evaluation and consideration of a strategic transaction, Engility held preliminary discussions with Guggenheim Securities on June 14, 2018, regarding its

potential engagement as Engility's financial advisor. Engility subsequently entered into an engagement letter with Guggenheim Securities on July 5, 2018.

31.     At the direction of the Engility Strategy Committee, representatives of Guggenheim Securities contacted four potential strategic partners (in addition to Company A and SAIC) to discuss such companies' interest in exploring a strategic transaction with Engility. Following this outreach, one company in the government services industry ("Company B"), and one company in the construction, engineering and government services industry ("Company C"), expressed their interest in conducting discussions to explore a potential strategic transaction with Engility.

32.     On July 2, 2018, Engility entered into a non-disclosure agreement with Company C to facilitate the exchange of confidential information and further discussions between Engility and Company C. One week later, on July 9, 2018, members of the Engility management team and Guggenheim Securities met with representatives of Company C in Washington D.C. to exchange preliminary information.

33.     On July 10, 2018, Company B entered into a non-disclosure agreement with Engility to facilitate the exchange of confidential information and further discussions between Engility and Company B.

34.     Throughout the early part of July, Engility continued to hold discussions with Company A regarding a potential transaction.

35.     On July 12, 2018, the Engility Strategy Committee held a meeting with other members of the Engility Board to discuss the on-going meetings with each of SAIC, Company A, Company B and Company C. Later that day, representatives from Company A informed Engility and Guggenheim Securities, and representatives from Company C informed Guggenheim

Securities, that Company A and Company C, respectively, were no longer interested in pursuing a strategic transaction with Engility.

36.     With only two interested entities remaining, on July 13, 2018, at the direction of the Engility Strategy Committee, Guggenheim Securities delivered a first round process letters to SAIC and Company B, respectively, requesting that the two entities submit a preliminary indication of interest on or before July 20, 2018.

37.     On July 17, 2018, SAIC submitted a preliminary, non-binding indication of interest to Engility offering all-stock consideration at a fixed exchange ratio of 0.436 of a share of SAIC common stock for each share of Engility common stock, which would result in pro forma ownership by Engility stockholders of approximately 27% of the combined company.

38.     On July 20, 2018, representatives from a financial sponsor with experience and multiple past and present portfolio companies in the aerospace and defense sector ("Company D") approached Guggenheim Securities to express its interest in exploring a potential transaction with Engility.

39.     On July 23, 2018, Company B submitted a preliminary, non-binding indication of interest to Engility, with all-cash consideration at a range of $37.00-38.00 per share of Engility's common stock.

40.     The same day that Engility received a preliminary, non-binding indication of interest from Company B the Engility Strategy Committee met to discuss the level of interest of the various prospective bidders. After discussion, the Engility Strategy Committee concluded that it would be in Engility's best interest to engage with Company D, and instructed management to negotiate a non-disclosure agreement with Company D and allow Company D to conduct

preliminary diligence. Company D entered into a non-disclosure agreement with Engility on July 25, 2018 and met with members of Engility management on July 26, 2018.

41.    Company D moved quickly after entering into a non-disclosure agreement with Engility and, on August 3, 2018, Company D submitted a preliminary, non-binding initial indication of interest to Engility, with an all-cash consideration at a range of $35.00 - $39.00 per share of Engility's common stock. Following further communications between the two entities, on August 8, 2018, Company D submitted a revised proposal that proposed a range of $37.00 - $39.00 per share of Engility's common stock.

42.    On August 11, 2018, Company B informed Engility management that it would not be continuing in the transaction process due to its view of the OCI risk related to the transaction. With only two potential bidders remaining in the sale process, on August 14, 2018, second-round process letters were distributed to SAIC and Company D, requesting that final bids be submitted on or before September 4, 2018 and that comments to the draft merger agreement be provided by August 27, 2018.

43.    On September 4, 2018, SAIC submitted a revised indication of interest to Guggenheim Securities offering a fixed exchange ratio of 0.450 of a share of SAIC common stock in exchange for each share of Engility common stock. SAIC's offer equated to an implied offer price of $40.96 based on the September 4, 2018 closing price for SAIC's common stock. That same day, Company D informed Guggenheim Securities that it did not intend to submit a final bid.

44.    Following the submission of SAIC's bid, Engility, and its representatives, made numerous attempts to negotiate an increase in the exchange ratio but SAIC was unwilling to increase the Merger Consideration beyond the current exchange ratio of 0.450.

45.     On September 9, 2018, the Engility Board held a telephonic meeting to review the final transaction terms, and consider final drafts of the merger agreement. During the meeting, tepresentatives of Guggenheim Securities reviewed with Engility's board of directors Guggenheim Securities' financial analysis of the exchange ratio and rendered an oral opinion that the exchange ratio in connection with the merger was fair, from a financial point of view, to the Engility stockholders. Following this presentation, the Engility Board unanimously adopted resolutions approving the merger agreement and the merger, the execution of the merger agreement and the consummation of the transactions contemplated thereby and declaring advisable and recommending that the Engility stockholders vote to approve and adopt the merger agreement.

46.     Later that same day, Engility and SAIC executed the merger agreement, and on September 10, 2018, SAIC and Engility issued a joint press release announcing the merger agreement.

47.     Following the execution of the merger agreement, Birch Partners, L.P. a Delaware limited partnership ("Birch"), which owns 17,920,892 shares, or approximately 48.48% of the total outstanding shares, of Engility common stock as of September 5, 2018, entered into a voting agreement with SAIC and Engility to vote the in favor of the adoption of the merger agreement.

**The Merger Announcement**

48.     In a press release dated September 10, 2018, Engility announced that it had entered into a Merger Agreement with SAIC pursuant to which SAID will acquire all of the outstanding shares of Engility in an all-stock transaction at a fixed exchange ratio of 0.450 SAIC shares for each Engility share.

49.     The press release states in pertinent part:

April RESTON, Va. & CHANTILLY, Va.--(BUSINESS WIRE)--Science Applications International Corp. (NYSE: SAIC) and Engility Holdings Inc., (NYSE: EGL) today announced that they have entered into a definitive agreement

under which SAIC will acquire Engility in an all-stock transaction valued at $2.5 billion ($2.25 billion net of the present value of tax assets), creating the second largest independent technology integrator in government services with $6.5 billion of pro-forma last 12 months' revenue.

The combination of these two complementary businesses will accelerate SAIC's growth strategy into key markets, enhance its competitive position and provide significant financial benefits.

"The highly complementary portfolios, combined with our similar cultures, operating models, and histories, make this transaction a compelling combination that enhances the value proposition for our customers, employees, and shareholders," said SAIC CEO Tony Moraco. "We look forward to welcoming the Engility team into SAIC, as together we create a market leader in government services with more than 23,000 employees."

The transaction will create market sub-segment scale in strategic business areas of national interest, such as defense, federal civilian agencies, intelligence, and space. In addition, it expands the capabilities of both companies, bringing additional systems engineering, mission, and IT capabilities to a broader base of customers.

"Engility's market-leading expertise in next-generation systems engineering and integration services, particularly among space, federal, and intelligence customers, will augment SAIC's strong mission, engineering and enterprise IT offerings to create a more comprehensive suite of capabilities serving a broader set of customers," said Engility Chairman, CEO and President Lynn Dugle. "The combined capabilities of the two companies will have the capacity and differentiated solutions that can best meet our customers' demands and take advantage of improved market conditions."

The combination will enhance shareholder value creation, with greater customer access and more competitive and differentiated solutions, supported by more than $375 million in pro-forma annual free cash flow to enhance capital deployment flexibility and $150 million of expected annual gross cost synergies ($75 million of expected annual net cost synergies, after consideration of the pro-forma company's cost type contract mix). Upon closing, SAIC shareholders will own approximately 72% and Engility shareholders will own approximately 28% of the combined company on a pro forma, fully diluted basis.

**Transaction Terms and Financing**

Under the terms of the merger agreement, Engility stockholders will receive a fixed exchange ratio of 0.450 shares of SAIC common stock for each share of Engility stock in an all-stock transaction. Based on an SAIC per share closing price of $89.86 on September 7, 2018, the transaction is valued at $40.44 per share of

Engility common stock or $2.5 billion in the aggregate, including the repayment of $900 million in Engility's debt.

SAIC has obtained a financing commitment letter from Citigroup Global Markets Inc. for a new seven-year senior secured $1.05 billion term loan facility under our existing credit agreement. The proceeds will be used to repay Engility's existing debt and associated fees. SAIC expects no immediate change to its quarterly cash dividend as a result of this transaction.

The transaction is expected to close by the end of the fiscal fourth quarter ending February 1, 2019, following customary closing conditions, including regulatory and SAIC and Engility shareholder approvals. The transaction has been unanimously approved by both Boards of Directors. The businesses will continue to operate separately until the transaction closes.

**Governance and Management**

The combined company will retain the SAIC name and continue to be headquartered in Reston, Virginia. Following closing, Tony Moraco will continue as CEO and as an SAIC Board member. SAIC will expand its board to include two additional members from Engility's Board of Directors.

**The Registration Statement Omits Material Information**

50.     On October 18, 2018, Engility filed the Registration Statement with the SEC. As alleged below and elsewhere herein, the Registration Statement contains material misstatements and omissions of fact that must be cured to allow Engility's stockholders to render an informed decision with respect to the Proposed Transaction.

51.     Specifically, as discussed below, the Registration Statements omits material information regarding the background of the transaction, conflicts involving the financial advisor, and the financial analyses performed by Guggenheim. This material information directly impacts the Company's expected future value as a standalone entity, and its omission renders the statements made materially misleading and, if disclosed, would significantly alter the total mix of information available to Engility stockholders. Accordingly, Engility stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

*Material Omissions Concerning the Guggenheim's Financial Analyses:*

52.     The description in the Registration Statement of Guggenheim's fairness opinion, and the underlying analyses, omits key inputs and assumptions of Engility underlying these analyses. Without this information, as described below, Engility's public stockholders are being misled as to what weight, if any, to place on the financial advisor's fairness opinion in determining whether to vote in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Engility stockholders.

53.     With regard to the omission of material information relating to the sale process leading up to the Proposed Transaction, the Registration Statement indicates that the Company entered into non-disclosure agreements with a number of potentially interested parties. Specifically, the Registration Statement notes that Engility entered into separate nondisclosure agreements ("NDA") with SAIC, Company A,

54.     Specifically, with regard to Guggenheim's Engility Discounted Cash Flow Analysis, the S-4 fails to disclose the individual inputs and assumptions utilized by Guggenheim to derive the discount rate range of 9.0% to 10.25%. The S-4 also fails to disclose the range of implied terminal EBITDA multiples resulting from the analysis. Furthermore, the S-4 does not disclose how Guggenheim incorporated net tax assets in the analysis, if at all, and what specific normalization adjustments Guggenheim made to calculate Engility's terminal year cash flow, as well as the resulting terminal year cash flow metric.

55.     Similarly, with respect to the SAIC Discounted Cash Flow Analysis, the S-4 fails to disclose the individual inputs and assumptions utilized by Guggenheim to derive the discount rate range of 8.25% to 9.75%. The S-4 also fails to disclose the range of implied terminal EBITDA multiples resulting from the analysis. Furthermore, the S-4 does not disclose what specific

normalization adjustments Guggenheim made to calculate Engility's terminal year cash flow, as well as the resulting terminal year cash flow metric.

56.     Furthermore, with respect to the Engility Selected Precedent Merger and acquisition Transaction Analysis, the S-4 fails to disclose whether Guggenheim performed any type of benchmarking analysis for Engility in relation to the target companies. The S-4 also fails to disclose the calculated present value amount of tax benefits utilized by Guggenheim in its analysis.

57.     Similarly, with regard to the Engility Selected Publicly Companies Analysis, the S-4 fails to disclose whether Guggenheim performed any type of benchmarking analysis for Engility in relation to the selected public companies. The S-4 also fails to disclose the separate implied value ranges for each of the selected multiple ranges applied for EV/2018 EBITDA plus tax benefits, EV/2019 EBITDA plus tax benefits, EV/2018 EBITDA excluding tax benefits, and EV/2019 EBITDA excluding tax benefits.

58.     Finally, with respect to the SAIC Selected Publicly Companies Analysis, the S-4 fails to disclose whether Guggenheim performed any type of benchmarking analysis for SAIC in relation to the selected public companies. The S-4 also fails to disclose the separate implied value ranges for each of the selected multiple ranges applied for EV/2018 EBITDA and EV/2019 EBITDA.

59.     When a bankers' endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses are crucial to a fair presentation of the material facts. Furthermore, the disclosure of projected financial information provides stockholders with the best basis to project the future financial performance of a company, and

allows stockholders to understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. This information is therefore material, and must be disclosed if Engility's stockholders are to make a fully informed decision. The omission of this information renders the statements made concerning the financial advisors' analyses and opinions materially misleading.

60.     The omission of this material information renders the Registration Statement materially misleading, because it will tend to cause stockholders to accord more credibility and reliability to the valuation analyses than they would had they been afforded full disclosure. Without such omitted information, Engility's stockholders cannot evaluate for themselves whether the financial analyses performed by either financial advisor were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omitted information identified above is required in order to ensure that stockholders can evaluate the extent to which Guggenheim's opinions and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

61.     Furthermore, in addition to the material omissions identified above, the Registration Statement also omits to disclose any information concerning the preliminary financial analyses performed by Guggenheim.

62.     As noted in the Registration Statement, during the July 18, 2018 Strategy Committee meeting Guggenheim provided the Strategy Committee with a preliminary analysis of SAIC's initial proposal, as well as a sensitivity analysis at certain potential exchange ratios, as well as a preliminary valuation analysis of Engility on a standalone basis and pro forma combined basis with SAIC. These preliminary analyses are omitted from the Registration Statement, thereby

further limiting the information that Engility stockholders have in evaluating and understanding the work performed by Guggenheim.  Because any differences between the preliminary valuations and those finally presented by Guggenheim are currently concealed from the stockholders, the omission of the preliminary valuation analyses renders the statements made concerning Guggenheim's analyses and fairness opinion materially misleading, because any differences in the valuations would tend to highlight any flaws or faults in Guggenheim's opinion.

63.     The omission of this information renders certain portions of the Registration Statement false and/or materially misleading in contravention of the Exchange Act including, *inter alia*, the following section of the Registration Statement: (i) "*Opinion of Engility's Financial Advisor*;" and (ii) "*Certain Forecasts Prepared by Engility*."

### *Material Omissions Concerning the Sale Process:*

64.     With regard to the omission of material information relating to the sale process leading up to the Proposed Transaction, the Registration Statement indicates that the Company entered into non-disclosure agreements with a number of potentially interested parties. Specifically, the Registration Statement notes that Engility entered into separate nondisclosure agreements ("NDA") with SAIC, Company A, Company B, Company C, and Company D in connection with discussions of a potential strategic transaction.  However, the nature and extent of these agreements are not disclosed in the Registration Statement. Of particular importance to Engility stockholders, details regarding the terms of these non-disclosure agreements, including whether they contain standstill and/or "don't ask, don't waive" ("DADW") provisions that prohibit the counterparties from making an unsolicited superior proposal to Engility are worryingly absent from the Registration Statement.

65.     On June 13, 2018, Engility entered into a non-disclosure agreement with Company A to facilitate the mutual exchange of confidential information.[2] Later, on July 2, 2018, Engility entered into a non-disclosure agreement with Company C to facilitate the exchange of confidential information and further discussions between Company C and Engility. On July 10, 2018, Company B entered into a non-disclosure agreement with Engility to facilitate the exchange of confidential information and further discussions between Engility and Company B. Finally, Company D entered into a non-disclosure agreement with Engility on July 25, 2018. The terms of these agreements are not disclosed.

66.     Here, the complete absence of information regarding terms of the NDAs entered into by these entities is troubling. The Merger Agreement notes:

> The Company shall take all actions necessary to enforce its rights under the provisions of any "standstill" agreement between the Company and any Person (other than Parent), and shall not grant any waiver of, or agree to any amendment or modification to, any such agreement, to permit such person to submit a Company Acquisition Proposal; provided that the foregoing shall not restrict the Company from permitting a Person to orally and non-publicly request the waiver of a "standstill" or similar obligation or from granting such a waiver, in each case, to the extent the Company Board determines in good faith, after consultation with outside legal counsel, that the failure to take such action would reasonably be expected to be inconsistent with the directors' fiduciary duties under applicable Law.

Merger Agreement at A-44. The presence of this language in the Merger Agreement indicates that some and/or all of the nondisclosure agreements entered into between the interested entities and Engility included standstill agreements. However, without further information concerning the presence of standstill provisions or DADW provisions, including whether those provisions had

---

[2] Later, on July 12, 2018, the same day that Company A ostensibly communicated to Engility that it was withdrawing from the bidding process, Company A agreed to amend the non-disclosure agreement. However, the Registration Statement omits to disclose the reason for amending the nondisclosure agreement on July 12, 2018.

fallen away upon the execution of the Merger Agreement or were still in effect, Engility stockholders are unable to properly evaluate the ability of these parties that earlier expressed interest in a potential strategic transaction to offer them a better deal. If the NDAs contained standstill provisions or DADW provisions, then those bidders could only make a superior proposal by breaching the agreement, because in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly.

67.     Thus, the omission of this information renders the descriptions of the NDAs that the Company entered into materially incomplete and misleading, as the failure to disclose the existence of standstill and DADW provisions creates the false impression that any of the parties who signed non-disclosure agreements could have made a superior proposal. Clearly, any reasonable Engility shareholder would deem the fact that the most likely potential topping bidder in the marketplace may be precluded from making a superior offer as significant information. Furthermore, any references to these interested entities walking away from the bidding process at various points of the sale process are also misleading, as they give the impression that these entities are no longer interested in a potential transaction with Engility when it is more likely that their inability to re-engage is the result of provisions and restrictions in the NDAs.

68.     Accordingly, without further information regarding the terms of the NDAs, the Company's stockholders are being misled into assuming that these other entities, which were actively interested in acquiring the Company, and had already elected to submit a bid to acquire the Company, could make an offer to acquire the Company if they so choose – when they may be contractually precluded from doing so. It is therefore vital that Engility stockholders are provided with the material information regarding the terms of the NDAs.

69.     The omission of this information renders certain portions of the Registration Statement false and/or materially misleading in contravention of the Exchange Act including, inter alia, the *Background of the Merge* section of the Registration Statement.

### Material Omissions Concerning Conflicts of Interest

70.     Finally, the Registration Statement fails to disclose material information concerning potential conflicts of interest faced by both the Company's Financial Advisor, and SAIC's financial advisor Citigroup Global Markets Inc. ("Citi").

71.     Specifically, while the Registration Statement notes that Guggenheim Securities has not been previously engaged during the past two years by SAIC, to provide financial advisory, capital markets or other investment banking services for which Guggenheim Securities received fees, it fails to disclose whether Guggenheim provided services other than financial advisory, capital markets or other investment banking services to SAIC. Similarly, with respect to Citi, the Registration Statement omits to disclose whether Citi had provided any services to Engility or had a prior material relationship with Engility.

72.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives. Item 1015 of Reg M-A plainly requires the disclosure of "any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates. 17 C.F.R. § 229.1015(b)(4).  Where an investment bank is providing a fairness opinion that involves long-standing clients, it may be influenced to find a transaction fair to avoid irritating management and other corporate actors who stand to benefit from the transaction, as this will ensure future lucrative business. Here, the current disclosures, with respect to Engility, SAIC, Citi, and Guggenheim, are misleading and must be

corrected. A reasonable stockholder would want to know the important economic motivations of Citi and Guggenheim relating to their work and how that motivation could rationally lead Citi and Guggenheim to favor a deal.

73.     Based on the foregoing, the Registration Statement violates Section 14(a) of the Exchange Act and applicable SEC regulations by materially misleading Engility stockholders. Engility public shareholders lack critical information necessary to evaluate the Proposed Transaction.

74.     Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

75.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

76.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

77.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange

Act, provides that proxy statement communications with shareholders shall not contain "any

statement which, at the time and in the light of the circumstances under which it is made, is false

or misleading with respect to any material fact, or which omits to state any material fact necessary

in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

78.     Furthermore, Item 1015 of Regulation M-A requires "[a]ny report, opinion or

appraisal relating to the consideration or the fairness of the consideration to be offered to security

holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not

affiliates" to "[d]escribe any material relationship that existed during the past two years or is

mutually understood to be contemplated and any compensation received or to be received as a

result of the relationship between: (i) The outside party, its affiliates, and/or unaffiliated

representative; and (ii) The subject company or its affiliates." 17 CFR 229.1015.

79.     The omission of information from a proxy statement will violate Section 14(a) and

Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

80.     Here, Defendants have issued the Registration Statement with the intention of

soliciting stockholder support for the Proposed Transaction. Each of the Defendants reviewed and

authorized the dissemination of the Registration Statement, which fails to provide critical

information regarding, amongst other things: (i) the background of the transaction; (ii) the

valuation analyses performed by the Company's financial advisors, in support of their fairness

opinions; and (iii) the potential conflicts of interest involving the financial advisors.

81.     In so doing, Defendants made untrue statements of fact and/or omitted material

facts necessary to make the statements made not misleading. Each of the Individual Defendants,

by virtue of their roles as officers and/or directors, were aware of the omitted information but failed

to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to Engility common stockholders although they could have done so without extraordinary effort.

82.     The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement notes that the financial advisors reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by the financial advisors, as well as their respective fairness opinions and the assumptions made and matters considered in connection therewith.

83.     Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the financial advisors' analyses in connection with their receipt of the fairness opinion, question the advisors as to the derivation of fairness, and be particularly attentive to the procedures followed in

preparing the Registration Statement, and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

84.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

85.     Engility is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

86.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff and Engility stockholders, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Engility stockholders have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Engility stockholders be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Against the Individual Defendants for
### Violations of § 20(a) of the 1934 Act

87.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

88.     The Individual Defendants acted as controlling persons of Engility within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Engility and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

89.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Registration Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

90.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the creation of the Registration Statement.

91.     The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

92.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

93.     As set forth above, the Individual Defendants had the ability to exercise control over, and did control, a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Plaintiff is threatened with irreparable harm.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

a)   declaring that the Registration Statement is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b)   preliminarily and permanently, enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Registration Statement;

c)   to the extent the Proposed Transaction is consummated prior to the Court's entry of a final judgment, awarding Plaintiff rescissory damages against the Individual Defendants, including, but not limited to, pre-judgment and post-judgment interest;

d)   awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

e)   granting Plaintiff such further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


Dated: November 6, 2018                 **LEVI & KORSINSKY LLP**

                                        */s/ Elizabeth K. Tripodi*
                                        Elizabeth K. Tripodi
                                        1101 30th Street, N.W., Suite 115
                                        Washington, D.C. 20007
                                        Telephone: (202) 524-4290
                                        Facsimile: (202) 333-2121
                                        Email: etripodi@zlk.com

                                        *Attorneys for Plaintiff*